## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

RANDY C. HUFFMAN, in his official
capacity as CABINET SECRETARY OF
THE WEST VIRGINIA DEPARTMENT
OF ENVIRONMENTAL PROTECTION,
and acting on behalf of the STATE OF
WEST VIRGINIA,

      Plaintiffs,

      v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; LISA P.
JACKSON, in her official capacity as
ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; UNITED STATES ARMY
CORPS OF ENGINEERS; JOHN M.
MCHUGH, in his official capacity as
SECRETARY OF THE ARMY;
LIEUTENANT GENERAL ROBERT L.
VAN ANTWERP, in his official capacity
as UNITED STATES ARMY CHIEF OF
ENGINEERS AND COMMANDING
GENERAL OF THE UNITED STATES
ARMY CORPS OF ENGINEERS,

      Defendants.

Civil Case No. _____

2:10-1189

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I. Introduction

1.    Plaintiff Randy C. Huffman, in his official capacity as Cabinet Secretary of the

West Virginia Department of Environmental Protection ("WVDEP"), and acting on

behalf of the State of West Virginia (sometimes referred to as "West Virginia" or the

"State," and together with WVDEP, the "Plaintiffs"), brings this complaint for

declaratory and injunctive relief against defendants United States Environmental

Protection Agency ("EPA"), Lisa P. Jackson in her official capacity as the Administrator of EPA, United States Army Corps of Engineers ("the Corps"), John McHugh in his official capacity as the Secretary of the Army, and Lieutenant General Robert L. Van Antwerp in his official capacity as the United States Army Chief and Commanding General of the Corps (collectively "Defendants").

2.     This civil suit seeks relief from a series of actions taken by EPA and the Corps that unlawfully seek out and target surface coal mining in West Virginia and five other Appalachian states.  With these actions, EPA and the Corps have demonstrated a brazen disrespect for the notice-and-comment rulemaking that forms the backbone of proper regulatory action by giving the States and interested parties an opportunity to comment upon proposed rules *before* implementation.   Instead, the Defendants have acted unilaterally in reliance on questionable scientific literature, much of which has not withstood proper review from the scientific community.  Beginning as early as January 2009, EPA appeared impatient and anxious – "champing at the bit" – to take a stand against certain types of mining in select Appalachian states with utter disregard for the economic impact upon the people in those states.  EPA's unjustified and unlawful actions have obstructed and delayed permitting processes under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, to such degree that, absent judicial intervention, they could sound the death knell for surface coal mining in West Virginia and five other Appalachian states.

3.     The Plaintiffs bring this action under Sections 702 and 706 of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702, 706, challenging the Enhanced Surface Coal Mining Pending Permit Coordination Procedures issued by EPA and the

Corps on June 11, 2009 (the "ECP"), and the Detailed Guidance Memorandum issued by EPA on April 1, 2010 (the "Detailed Guidance"). Those two documents became effective immediately upon their issuance and have been applied by EPA and the Corps to pending permit applications for West Virginia surface mining operations.

4.     Those agency actions were taken outside of formal rulemaking procedures and amount to *de facto* substantive rule changes in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 500 *et seq.*  The ECP and Detailed Guidance constitute final agency actions because they have been and continue to be used as standards by which EPA and the Corps make decisions regarding, comment on, and object to surface (and other) mining permits, including those permits affecting West Virginia.

5.     The Detailed Guidance is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because it establishes illegal presumptions for the Corps's environmental analysis under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*  The agencies also did not follow NEPA in adopting either the ECP or the Detailed Guidance.

6.     The Detailed Guidance is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because, in adopting a new water quality standard based on conductivity, the Detailed Guidance relies on certain studies that purport to be scientific but actually are policy driven. Moreover, the Detailed Guidance focuses particularly on the effect of conductivity on one order of insects, *Ephemeroptera,* commonly known as "mayflies," while ignoring its broader effects, if any, on other plants and animals, and on human activity. Additionally, the ECP and the Detailed Guidance

together have impermissibly altered the statutory allocation of authority under the CWA between EPA, the Corps, and the State.

7.      Those extra-regulatory actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because they have invaded and usurped the authority of the State of West Virginia, and that of WVDEP, to perform the following functions related to the regulation of surface coal mining:  the development of water quality standards under CWA Section 303, 33 U.S.C. § 1313; the certification of water quality under CWA Section 401, 33 U.S.C. § 1341; the administration of the National Pollutant Discharge Elimination System ("NPDES") permitting program under CWA Section 402, 33 U.S.C. § 1342; and the administration of the permitting process under the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 *et seq.*  In the Clean Water Act, Congress clearly provided that States have the primary responsibility and right to prevent, reduce, and eliminate water pollution, to plan the development and use of water resources, and to consult with the EPA Administrator, *see* 33 U.S.C. § 1251(b); EPA has wholly disregarded that directive.

8.      Pursuant to Congress's allocation of authority, the State of West Virginia has the authority to establish narrative water quality standards that it determines will best protect the overall well-being of the State's waters.  The West Virginia Legislature has concluded that the most effective way to protect the State's water quality is to take a holistic approach to measuring quality rather than by focusing on only one numerical criterion (such as EPA's new conductivity water quality standard).  The Detailed Guidance overrides West Virginia's properly promulgated water quality standards and, because water conductivity alone does not accurately measure the overall quality of a

4

stream, EPA has compromised WVDEP's ability to adequately monitor and protect the quality of the State's streams and other waters and the aquatic ecosystems therein.

9.    The ECP and the Detailed Guidance also have caused undue delay and presented impediments to the issuance of surface mining permits, thereby threatening the economic well-being of the State of West Virginia and its citizens and imperiling the general public interest in preserving a supply of coal necessary to meet the nation's energy needs, in contravention of the expressed goals of SMCRA.

10.    To protect the vital public interests discussed above, the Plaintiffs seek an order from this Court declaring the ECP and the Detailed Guidance to be unlawful, enjoining their implementation, and vacating those documents as arbitrary, capricious, an abuse of discretion, and otherwise contrary to law in violation of the APA, the CWA, NEPA, and SMCRA.  Plaintiffs also ask this Court to order that the proper regulatory and statutory review processes, which existed prior to and were improperly amended by the ECP and the Detailed Guidance, be reinstated.  And finally, Plaintiffs ask this Court to declare that the State of West Virginia retains its right to establish water quality standards for the State's waters and that WVDEP retains the authority to control the relevant permitting processes under its purview, including the right to apply the narrative water quality standards and to issue Guidance Documents interpreting and implementing those standards.

## II. Jurisdiction and Venue

11.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.  This Court may grant the relief requested herein under 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 701-706.

12.    Venue is proper in the Southern District of West Virginia under 28 U.S.C. § 1391(e), because the seat of government for the State of West Virginia is Charleston, *see* W.Va. Const. Art. VI, § 6-20, WVDEP is headquartered in Charleston, West Virginia, *see* 28 U.S.C. § 1391(e)(3), and a substantial part of the real property at issue, upon which the affected surface mining operations are or would be conducted, is located within the Southern District, *see id.* § 1391(e)(2).

### III. Parties

13.    Plaintiff Randy C. Huffman brings this action in his official capacity as Cabinet Secretary of the West Virginia Department of Environmental Protection and he is acting on behalf of the State of West Virginia.  WVDEP is an agency of the State of West Virginia headquartered in Charleston, West Virginia.   WVDEP is charged with administering all relevant permits for surface coal mining operations in the State and with interpreting and following the water quality standards set by the West Virginia Legislature.

14.    Defendant United States Environmental Protection Agency is the federal agency charged with the administration and enforcement of many federal environmental laws.  EPA is headquartered in Washington, D.C.  As is relevant to this particular case, EPA promulgates CWA Section 401(b)(1) Guidelines, which the Corps must follow in issuing CWA Section 404 dredged-or-fill disposal permits.  *See* 33 U.S.C. § 1344(b)(1). EPA also has the ability to approve state water quality standards, *see* 33 U.S.C. § 1313, to object to the Corps' decision to issue a Section 404 permit under certain circumstances, *see* 33 U.S.C. § 1344(c), and to object to a state's decision to issue a CWA 402, or

National Pollutant Discharge Elimination System ("NPDES"), permit under certain circumstances, *see* 33 U.S.C. § 1342(d)(2).

15.     Defendant Lisa P. Jackson is named in her official capacity as the EPA Administrator.  As EPA Administrator, Ms. Jackson bears the ultimate responsibility for EPA's actions; she also is a signatory to the ECP and other relevant agency letters and/or memoranda discussed in greater detail below.  The Administrator's office, like EPA headquarters, is located in Washington, D.C.

16.     Defendant United States Army Corps of Engineers is the federal agency charged with issuing dredged-or-fill discharge permits under CWA Section 404, including those associated with surface mining operations.  *See* 33 U.S.C. § 1344(b)(1). The Corps is headquartered in Washington, D.C.

17.     Defendant John M. McHugh is named in his official capacity as the Secretary of the Army, which has ultimate responsibility for the issuance of CWA Section 404 permits by the Corps.  The Department of the Army is headquartered in Washington, D.C.

18.     Defendant Lieutenant General Robert L. Van Antwerp is named in his official capacity as the Chief of Engineers and Commanding General of the Corps, located in Washington D.C.  As head of the Corps, Lt. Gen. Van Antwerp is charged with the supervision and management of all of the Corps' decisions and actions.

### IV.  Statutory Framework

19.     Coal mining operations are subject to a complicated web of statutory and regulatory provisions, which are administered by federal agencies as well as by the States, including West Virginia in this case.  That statutory framework consists of:  the

Clean Water Act ("CWA"), which includes two types of permits (Section 402 NPDES permits and 404 permits), as well as the establishment of water quality standards under CWA Section 303 and the issuance of state water quality certification under CWA Section 401; the Corps' NEPA review of Section 404 permits; state-issued surface mining permits under SMCRA; and the APA. To fully understand the factual background of this case, one also must understand the relevant statutory and regulatory framework within which those facts operate. Accordingly, that framework is described below.

## A. Clean Water Act

### 1. Water Quality Standards under Section 303

20.     Congress intended to allocate primary responsibility for water pollution control to the states, *see* 33 U.S.C. § 1251(b), which included giving the states the ability to develop water quality standards under CWA Section 303. Under Section 303, states may establish, review, and revise water quality standards, subject to EPA approval. *See id.* § 1313; *see also* 40 C.F.R. § 131.4. A water quality standard establishes the water quality goals of a body of water by designating the uses for that body of water and then setting criteria intended to protect those uses. *See* 40 C.F.R. § 131.2. Those standards may be specific numeric criteria or holistic narrative standards.

21.     Because Congress intended States to take the lead in setting water quality standards, EPA's role is a limited one. First, EPA is empowered, after consulting with the appropriate federal and state agencies, officials, and other interested persons, to develop and publish water quality criteria reflecting the latest scientific knowledge. *See* 33 U.S.C. § 1314(a). But those criteria are not binding on the States and are not

independently enforceable; a state may adopt, modify, or reject EPA's published criteria so long as it has a sound, scientific rationale for doing so. Secondly, EPA is empowered to review and approve or disapprove state-adopted water quality standards. *See* 33 U.S.C. § 1313; 40 C.F.R. § 131.21. If EPA determines that a state's new or revised water quality standard does not satisfy the CWA, EPA must notify the state within a particular timeframe and specify the changes that EPA feels are necessary. *See* 33 U.S.C. § 1313(a), (c); 40 C.F.R. §§ 131.5, 131.21. If a state fails to make the necessary changes, only then may EPA promulgate a water quality standard, and EPA must do so in a published regulation pursuant to a statutorily-prescribed timeframe. *See* 33 U.S.C. § 1313(b), (c).

22.    The State of West Virginia has adopted narrative water quality standards that predate its NPDES primacy (a concept explained in greater detail below). Those water quality standards state in relevant part: "No significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed." W. Va. Code R. § 47-2-3.2.i.

23.    The West Virginia Water Pollution Control Act also provides that it is "the public policy of the state of West Virginia to maintain reasonable standards of purity and quality of the water of the state consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development." W. Va. Code § 22-11-2(a).

24.     The West Virginia Legislature recently reiterated that the State has the authority to establish and interpret water quality standards.   In House Concurrent Resolution 111, unanimously adopted in the 2010 Regular Session, the Legislature resolved as follows:

      a.  That WVDEP is charged with any interpretation and implementation of West Virginia's narrative water quality standards;

      b.  That the narrative water quality standards are satisfied when a stream:

          i.  Supports a balanced aquatic community diverse in species composition;

          ii.  Contains appropriate trophic levels of fish (that is, appropriate levels of fish on each level of the food chain), provided that the stream has sufficient water flow to support fish populations;

          iii.  And the aquatic community is not composed only of pollution-tolerant species or the aquatic community is composed of benthic invertebrate assemblages sufficient to perform the biological functions necessary to support fish communities within the assessed reach, or if the assessed reach has insufficient flows to support a fish community, in the downstream reaches where fish are present;

      c.  That interpretation of West Virginia's water quality standards must faithfully balance environmental protection with the need to maintain and expand employment, agricultural, and industrial opportunities.

### 2. Section 402 Permits (NPDES Permits)

25.    Also relevant to this action are the two types of CWA permits generally required for surface coal mining operations:   Section 402 permits and Section 404 permits.   Section 402 permits, also called NPDES permits, regulate point source discharges of pollutants into waters of the United States, set specific discharge limits and establish monitoring, reporting, and other requirements. *See* 33 U.S.C. § 1311(b)(2).   An NPDES permit includes effluent limits for a pollutant if WVDEP determines that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a state numeric criteria within a State water quality standard for an individual pollutant.  *See id.* § 1312; 40 C.F.R. § 122.44(d).

26.    EPA is charged with administering the NPDES program under Section 402 of the CWA, but because Congress intended to allocate the primary responsibility for water pollution control to the States under the CWA, *see* 33 U.S.C. § 1251(b), EPA can authorize a state to assume many of the permitting responsibilities under a system of cooperative federalism. *See id.* § 1342(b).  Once a state is so authorized, EPA suspends its own NPDES permitting program. *See id.* § 1342(c)(1).

27.    West Virginia is among those states that have assumed NPDES permitting authority.  West Virginia has had primacy to administer that program since 1982 and WVDEP is the state agency charged with that administration.

28.    EPA has limited authority to review WVDEP's actions as they relate to NPDES permitting.   Specifically, EPA has the authority to object under specific circumstances to a particular NPDES permit authorizing discharges within West Virginia.

*See id.* § 1342(d)(2), (4); 40 C.F.R. § 123.44.  If WVDEP does not adequately respond to EPA's objection within a specified time, EPA may assume authority to issue the particular permit.  *See* 33 U.S.C. § 1342(d)(4).  But if EPA does not object to a permit based on statutory or regulatory grounds, within specified times and by following specified procedures, WVDEP may proceed with issuing the permit.

### 3. Section 404 Permits

29.     Section 404 of the CWA regulates the discharge of dredged-or-fill material in the waters of the United States.  Section 404(a) grants authority to the Secretary of the Army to issue permits for the discharge of dredged-or-fill material.  *See* 33 U.S.C. § 1344(a).  The Secretary of the Army has delegated that authority to the Corps.  *See* 30 C.F.R. § 325.2(a).

30.     The Corps has issued regulations governing the issuance of a Section 404 permit, which are codified at 33 C.F.R. Pt. 325.  Sections 325.1(d) and (e) specify what information must be contained in a Section 404 permit application and provide that the district engineer is the decision-maker in this permitting process—he or she has the authority to determine what, if any, additional information is needed from the applicant to make a public interest determination and to determine whether the application complies with the EPA-established Section 404(b)(1) Guidelines.

31.     Those regulations also mandate the procedures and deadlines by which the Corps must process Section 404 permit applications, which include public notice and comment procedures required by the CWA.  *See* 33 U.S.C. § 1344(a); 33 C.F.R. § 325.2(a), (d); *id.* § 325.3.  A district engineer normally must issue a public notice of the application within fifteen days of receiving it.  33 C.F.R. § 325.2(a)(2).  The district

engineer also may consider whether a public hearing should be held on the application. *Id.* § 325.2(a)(5).

32.    The CWA and the Corps' regulations emphasize the timely processing of Section 404 permit applications.   The statute provides that "to the maximum extent practicable, a decision with respect to an application for a permit . . . will be made not later than the ninetieth day after the date the notice for such application is published[.]" 33 U.S.C. § 1344(q).  The regulations have interpreted that ninety-day window to provide for a sixty-day decision timeframe, with a thirty-day extension at the applicant's request. *See* 33 C.F.R. § 325.2(a)(3); *id.* § 325.2(d)(3).  The sixty-day window may be extended only for certain reasons, as the regulations provide that "[d]istrict engineers will decide on all applications not later than 60 days after receipt of a complete application unless (i) precluded as a matter of law or procedures required by law . . . ,  (ii) The case must be referred to higher authority . . . , (iii) The comment period is extended; (iv) A timely submittal of information or comments is not received from the applicant, (v) The processing is suspended at the request of the applicant, or (vi) Information needed by the district engineer for a decision on the application cannot reasonably be obtained within the 60-day period."  33 C.F.R. § 325.2(d)(3).

33.    The Corps must follow NEPA in considering Section 404 permit applications. *See* 33 C.F.R. § 325.2(a)(4), (6).

34.    The Corps has provided that a permit applicant has the right to "an independent decision by the [Corps'] district or division engineer," and has stated that the regulatory decisionmaking process "must be strictly observed."  30 C.F.R. § 325.2(e)(3).  Moreover, district engineers may add conditions to a permit when necessary to satisfy legal

requirements or the public interest, but those conditions must be directly related to the impacts of the proposed project, appropriately scaled to the scope and degree of those impacts, and reasonably enforceable.  *See* 33 C.F.R. § 325.4(a).

35.    The CWA establishes a limited role for EPA in the Corps' permitting process. First, EPA is empowered to establish CWA 404(b)(1) Guidelines by which the Corps will evaluate Section 404 permit applications and which are developed in conjunction with the Corps.  *See* 33 U.S.C. § 1344(b)(1).  Those Guidelines are codified at 40 C.F.R. Part 230 and state that "[g]uidance on interpreting and implementing these Guidelines may be prepared jointly by the EPA and the Corps at the national or regional level from time to time.  No modifications to the basic application, meaning, or intent of these Guidelines will be made without rulemaking by the [EPA] Administrator under the Administrative Procedure Act (5 U.S.C. § 551 *et seq.*)."  40 C.F.R. § 230.2(c).

36.    EPA also may prevent the Corps from authorizing certain disposal sites under limited circumstances.   More specifically, the EPA Administrator "whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas" is empowered to prohibit the specification of any defined area as a disposal site.  33 U.S.C. § 1344(c).  However, "[b]efore making such determination, the [EPA] Administrator shall consult with the [Corps].  The [EPA] Administrator shall set forth in writing and make public his findings and his reasons for making any determination" that the Corps may not issue a Section 404 permit under EPA's Section 404(b)(1) Guidelines.  *Id.*; *see also* 40 C.F.R. § 231.2(e).

**4. Section 401 Certifications**

37.     The State of West Virginia is responsible for issuing CWA Section 401 water quality certifications that are required for the Corps' Section 404 permits. *See* 33 U.S.C. § 1341(a). This ensures that mining projects will not violate the State's applicable water quality standards or stream designated uses.

38.     WVDEP is the state agency in West Virginia that issues Section 401 water quality certifications for Section 404 dredged-or-fill permits.

**B. National Environmental Policy Act**

39.     NEPA, 42 U.S.C. § 4331 *et seq.*, requires that federal agencies must take a "hard look" at the potential environmental consequences of their proposed actions before acting. NEPA is a procedural statute rather than a substantive one—it does not mandate the outcome of an agency's environmental analysis. Rather, NEPA dictates the steps an agency must follow to ensure that it fully considers the potential environmental consequences before acting. There are three levels of NEPA analysis, the application of which depends on whether an agency's proposed action could significantly affect the environment.

40.     First, a proposed undertaking may be excluded categorically from further environmental analysis if it meets certain criteria that an agency previously has determined will have no significant environmental impact. *See* 40 C.F.R. § 1501.4.

41.     If the proposed action is not categorically excluded, the agency prepares an environmental assessment ("EA") to determine whether or not the proposed action would significantly affect the environment. *See id.* §§ 1501.4(b), 1508.9. An EA is a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis

for determining whether to prepare an environmental impact statement [("EIS")] or a finding of no significant impact [("FONSI")]." 40 C.F.R. § 1508.9(a)(1); *see also id.* §§ 1501.4(e), 1508.13.

42.     If the EA reveals that the environmental consequences may "significantly affect[] the quality of the human environment," the agency must prepare an EIS, which is a more detailed evaluation of the proposed action and alternatives to that action.   42 U.S.C.  §  4332(2)(C).    The  phrase  "human  environment"  has  been  defined "comprehensively to include the natural and physical environment" as well as "the relationship of people with that environment."  40 C.F.R. § 1508.14.  Significance is measured by evaluating both the context of the action and the severity of its environmental impact.  *See* 40 C.F.R. § 1508.27.  The EIS must include a detailed statement on the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided, alternatives to the proposed action, the relationship between the environmental uses and enhancement of productivity, and any irreversible and irretrievable commitments of resources which would be involved in the proposed action. *See id.*

43.     It is possible for a federal agency to bypass preparation of an EA and to proceed directly to the preparation of an EIS if the agency anticipates that the proposed undertaking is likely to significantly affect the environment.

44.     Even if an agency concludes that a proposed agency action will have a significant environmental impact, the agency may avoid preparing an EIS if it finds that mitigating measures can be taken that will reduce the environmental impact of an action

below the level of significance.  In that instance, the agency may issue what is known as a mitigated FONSI.

45.    After the preparation of a draft EIS, the public has an opportunity to submit comments and a final EIS follows.

46.    Because NEPA's requirements are procedural and not substantive, even agency action that causes adverse environmental effects can satisfy NEPA as long as the agency properly has considered those effects and determined that competing values of the action outweigh its adverse environmental effects. *Id.* at 191.

47.    NEPA applies to the issuance of CWA Section 404 permits; dredged-or-fill permitting is an agency action for which the Corps must consider any environmental effects. *See* 33 C.F.R. § 325.2(a)(4), (6); *see also* 33 C.F.R. pt. 325, App. B, § 7(b)(1), (2) (providing that the Corps must "address the impacts of the specific activity requiring a [Department of the Army] permit and those portions of the entire project over which the [Corps] district engineer has sufficient control and responsibility to warrant federal review").

48.    The Corps is the lead agency responsible for preparing NEPA documents relating to Section 404 permit applications and, in preparing those documents, the district engineer must follow the Corps' NEPA Implementation Procedures codified at Appendix B to 33 C.F.R. pt. 325.

## C. Surface Mining Control and Reclamation Act

49.    SMCRA, 30 U.S.C. § 1201 *et seq.*, is a regulatory program that, among other things, regulates the disposal of excess spoil material resulting from surface coal mining operations.  SMCRA utilizes what is known as a "cooperative federalism approach," in

the regulation of surface coal mining. *See* 30 U.S.C. §§ 1201(f), 1253. Under SMCRA, states have exclusive jurisdiction over the regulation of surface coal mining and reclamation operations so long as the Department of Interior ("DOI") has approved the state's regulatory program. *See* 30 U.S.C. § 1253.

50.     WVDEP's SMCRA program was approved by DOI in 1981. Accordingly, WVDEP has exclusive jurisdiction over the regulation of valley fills and the disposal of excess spoil in the State of West Virginia. Anyone wishing to engage in surface coal mining in the state must obtain a permit from WVDEP. *See id.* § 1256(a).

**D. Administrative Procedures Act**

51.     Under the APA, a party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Parties may bring suit "in a court of the United States seeking relief other than monetary damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." *Id.*

52.     The APA allows a court to set aside agency actions that are "arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law when it violates federal statutes, such as the CWA, NEPA, and SMCRA.

53.     Section 553 of the APA establishes notice and comment procedures for federal rulemaking. *See* 5 U.S.C. § 553. This procedure ensures that the public receives notice of proposed agency rules or amendments and allows the public or other interested parties

"an opportunity to participate in the rule making through submission of written data, views or arguments . . . ." *Id.* § 553(c).

54.     When agencies make substantive revisions to applicable regulations without following formal APA-rulemaking procedures, they violate the APA.

### V.  Factual Background

55.     Plaintiffs set forth the following facts, which are alleged to the best of their knowledge, information and belief.  Any specific examples of agency actions referenced in this Complaint are intended to be illustrative only and are not intended to be exclusive or exhaustive.

### A.  EPA Objections and Comments Applying a New Conductivity Water Quality Standard

56.     The agency actions challenged herein arose from events beginning on or about January 2009.  On or about that time, EPA and the Corps began to adopt new extra-regulatory processes and water quality standards used to review surface mining permits. Those processes and standards, challenged herein, have resulted in undue delay and obstruction in the issuance of surface mining permits in West Virginia.  The permitting process has grown increasingly lengthy, EPA's comments on and objections to permits have increased, and markedly fewer surface mining permits have been approved than in previous years.

57.     EPA sent a letter to the Corps on January 20, 2009, in which it expressed its significant concerns about a proposed surface mining operation in West Virginia.  In that letter, EPA discussed the impact of surface coal mining on in-stream conductivity and

cited for the first time a 2008 study by Pond *et al.* analyzing in-stream conductivity as a measure of water quality and aquatic life.[1]

58.     On March 23, 2009, EPA sent letters to the Corps expressing concerns about two coal mining operations in West Virginia and Kentucky.  At the same time, EPA issued a press release describing those letters, stating that EPA had "serious concerns about the need to reduce the potential harmful impacts on water quality caused by certain types of coal mining practices, such as mountaintop mining.  The letters specifically addressed two new surface coal mining operations in West Virginia and Kentucky.  EPA also intends to review other requests for mining permits."  Ex. A, Press Release, EPA, EPA Acts to Reduce Harmful Impacts from Coal Mining (Mar. 24, 2009).  Administrator Jackson was quoted as saying that "[t]he two letters reflect EPA's considerable concern regarding the environmental impact these projects would have on fragile habitats and streams."  *Id.*  EPA indicated that it "expects to be actively involved in the review of these permits," *id.*, following the Fourth Circuit's decision affirming the Corps' permit review procedures in *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009).

59.     On or about April 2009, EPA issued a series of letters to the Corps recommending that the Corps deny certain Section 404 permit applications for surface coal mining operations in West Virginia.  EPA's letters contained its newly articulated conductivity water quality standard.  EPA commented on and objected to the permit applications based on its belief that the CWA 404(b)(1) Guidelines had not been met, or more specifically, that the water conductivity standard derived from the Pond *et al.* study

---

[1]         That study is also referred to by EPA as the "Pond-Passmore Study."

had not been satisfied.  EPA demanded that the Corps and the permit applicant(s) should,
*inter alia*, develop more stringent mitigation plans that would ensure that the affected
streams would meet the conductivity standard.

**B.  June 11, 2009 Memorandum of Understanding**

60.    On June 11, 2009, EPA, the Corps, and DOI entered into an interagency
Memorandum of Understanding ("MOU") in which they committed to a more stringent
review of surface coal mining permits in six Appalachian states:   West Virginia,
Kentucky, Ohio, Pennsylvania, Tennessee, and Virginia.[2]   *See* Ex. B.   The MOU
announced the agencies' plan to minimize the adverse environmental consequences of
surface coal mining, to coordinate environmental review of pending permit applications
under the CWA and SMCRA, and to engage in more robust public outreach to inform
federal, state, and local decision-making.

61.    The signatories to the MOU were Lisa P. Jackson, the Administrator of the
EPA, Terrence "Rock" Salt, the Acting Assistant Secretary of the Army, Civil Works,
and Ken Salazar, the Secretary of DOI.   Neither the State nor WVDEP were consulted
about the MOU.

**C.  June 11, 2009 Enhanced Coordination Procedures**

62.    Also on June 11, 2009, EPA and the Corps issued a memorandum entitled
"Enhanced Surface Coal Mining Pending Permit Coordination Procedures" ("ECP"),
which established a new review process for 108 pending CWA surface coal mining

---

[2]       The MOU, attached to this Complaint as Exhibit B, may also be found at Office of Surface Mining
Reclamation and Enforcement, Memorandum of Understanding Among the U.S. Department of the Army,
U.S. Department of the Interior, and U.S. Environmental Protection Agency, Implementing the Interagency
Action Plan on Appalachian Surface Coal Mining, http://www.osmre.gov/resources/
ref/mou/ASCM061109.pdf.

permits in the aforementioned Appalachian states (WV, VA, KY, PA, OH, and TN). That process began immediately and was intended to identify permit applications "about which the [relevant EPA] Regions have concerns" as well as those "with which the Corps may proceed without further action by EPA." Ex. C, Memorandum from Lisa P. Jackson, Administrator, EPA, and Terrence "Rock" Salt, Acting Assistant Secretary, Civil Works, Dept. of the Army (June 11, 2009), at 2.[3]

63.   More specifically, the Corps and EPA identified 108 pending permits for which the Corps would provide requested additional information to the relevant EPA Regions.   Within forty-five days of EPA's receipt of that information, EPA would propose a list of permits distinguishing between those permit applications that "concerned" EPA and those applications for which EPA had no environmental concerns and therefore for which the Corps was free to proceed with processing.

64.   Permit applications identified as "raising concern" would be subject to additional coordination and review. *Id.*   When the Corps was ready to proceed with enhanced coordination for each identified permit, it would notify the relevant EPA Region.[4]   At that time, the agencies would have sixty days "to coordinate and resolve each permit application of concern," although extension of that time period could be sought if necessary. *Id.* If, after that time period ended, the Corps chose to issue a permit despite "unresolved issues," the Corps would provide EPA with a written notice of

---

[3]      More information regarding the ECP may be found at EPA, Surface Coal Mining Activities Enhanced Coordination Procedures, http://water.epa.gov/lawsregs/guidance/wetlands/mining.cfm (last visited September 28, 2010).  That site includes the text of the ECP, *see* http://water.epa.gov/lawsregs/ guidance/wetlands/upload/2009_06_11_pdf_Final_MTM_Permit_Coordination_Procedures_6-11-09.pdf, as well as the list of 108 permits selected for further review under that process, *see* http://water.epa.gov/ lawsregs/guidance/wetlands/upload/2009_09_11_wetlands_pdf_ECP_Initial_List_09-11-09.pdf.

[4]      Three EPA regions cover the six Appalachian states—EPA Regions III, IV, and V.

22

decision to issue a permit detailing its response to EPA's concerns. *Id.* at 2-3. Upon receiving that notice, EPA would have ten days either to "advise the Corps District that it does not intend to pursue further action and the Corps, therefore, is free to make a permit decision" or to "initiate action under CWA Section 404(c)." *Id.* at 3.

65.    The ECP was issued without public notice and comment and was effective immediately upon its issuance. Administrator Jackson and Acting Assistant Secretary Salt were signatories to the ECP. Neither the State nor WVDEP were consulted about the ECP.

66.    Administrator Jackson, acting on behalf of EPA, sent a letter dated June 11, 2009, to Acting Assistant Secretary Salt of the Corps, detailing what factors EPA would use to identify pending permit applications that would require further coordination and review.[5] *See* Ex. D, Letter from Lisa P. Jackson, Administrator, EPA, to Terrence "Rock" Salt, Acting Assistant Secretary, Civil Works, Department of the Army (June 11, 2009).

67.    EPA proceeded to screen pending CWA Section 404 applications pursuant to a decision-making process that it called "MIRA," the Multi-criteria Integrated Resource Assessment.[6] That process was developed independently of the Corps and did not follow formal rulemaking procedures under the APA.

68.    As part of EPA's increased scrutiny of surface mining operations, EPA revoked the waiver of review of WVDEP's Section 402/NPDES permits. EPA had

---

[5]    That letter, attached to this Complaint as Exhibit D, is also available at http://www.epa.gov/owow/wetlands/pdf/Final_EPA_MTM_letter_to_Army_6-11-09.pdf.

[6]    That process is described in greater detail at EPA, Surface Coal Mining Enhanced Coordination Procedures, Multi-criteria Integrated Resource Assessment (MIRA), *available at* http://water.epa.gov/lawsregs/guidance/wetlands/mining-screening.cfm (last visited Sept. 28, 2010).

agreed to that waiver in the Memorandum of Agreement Regarding the Administration and Enforcement of the National Pollutant Discharge Elimination System in West Virginia, which EPA and West Virginia entered into in 1982 (the "MOA"). In that document, EPA waived its authority under the CWA to review NPDES permits issued by WVDEP, but retained its right to terminate the waiver. On July 7, 2009, EPA revoked that waiver for all West Virginia NPDES permits for discharges associated with surface coal mining permits and announced it would begin reviewing those permits. EPA also requested that WVDEP provide it with copies of all current and pending NPDES permits associated with all mining operations.

69. On September 11, 2009, EPA announced that its screening process had identified seventy-nine Section 404 permits currently pending with the Corps that it proposed should undergo a more stringent review under the ECP. That more stringent review allegedly was necessary because EPA had environmental concerns about those mining operations and believed that "[a]ll of the permits on the list showed the potential to violate one or more of the requirements in the [Section 404(b)(1)] Guidelines." Ex. E, EPA, Surface Coal Mining Activities Enhanced Coordination Procedures, Questions and Answers About the Final List (undated), at 3.[7]

70. Twenty-three, or 34%, of the proposed surface mining projects identified for ECP review were located in West Virginia. *See* Ex. F, ECP Initial List (Sept. 11, 2009).[8] Of that number, *only two* surface mining projects have been approved (that is, the Corps

---

[7]     That document, attached as Exhibit E, is also available at http://water.epa.gov/lawsregs/guidance/wetlands/upload/2009_09_30_wetlands_pdf_ECP_Q-A_09-30-09_final.pdf.

[8]     That list, attached as Exhibit F, is available at http://water.epa.gov/lawsregs/guidance/wetlands/upload/2009_09_11_wetlands_pdf_ECP_Initial_List_09-11-09.pdf.

has issued CWA Section 404 permits for those projects), six permit applications have been withdrawn, and fifteen remain pending as of the date of this Complaint. Those numbers dramatically illustrate the ECP's detrimental effect on proposed surface mining operations in West Virginia.

71.    Not only has the ECP led to the increased denial of permit applications, but it also has caused unlawful delay in permit processing beyond the ninety-day statutory timeframe set forth in 33 U.S.C. § 1344(q). That section provides that "to the maximum extent practicable, a decision with respect to a [dredged-or-fill] permit . . . will not be made later than the ninetieth day after the notice for such application is published . . . ." 33 U.S.C. § 1344(q). That timeframe cannot be and is not being met under the ECP because the sixty-day coordination period established in the ECP does not even begin to run until after the Corps receives EPA's list of permits allegedly causing EPA environmental concern. After the Corps receives the list, the Corps can, at its leisure, notify EPA when it is ready to proceed with that process as to each identified permit application—only then does the sixty-day coordinated review begin. Moreover, as described above, under the ECP, EPA and the Corps are authorized to seek an extension of that sixty-day period.

72.    Delay caused by the ECP has been experienced by West Virginia surface mine operators and permit applicants, as evidenced by the fact that fifteen West Virginia permit applications identified for ECP review on September 11, 2009, remain pending as of the date of this Complaint, more than one year later.

73.     EPA has "invited," and thus effectively required, WVDEP to refrain from issuing NPDES permits while the ECP review process is ongoing, which causes further delay and interferes with WVDEP's authority to issue NPDES and SMCRA permits.

**D.  April 1, 2010 Detailed Guidance**

74.     On April 1, 2010, EPA issued a Detailed Guidance Memorandum, entitled "Detailed Guidance: Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order."[9]  Ex. G, Memorandum from Peter S. Silva, Assistant Administrator for Water, and Cynthia Giles, Assistant Administrator for Enforcement and Compliance Assurance, EPA, to Shawn Garvin, EPA Region III Administrator, A. Stanley Meiburg, EPA Region IV Acting Administrator, and Bharat Mathur, EPA Region V Acting Administrator (Apr. 1, 2010).  The Detailed Guidance was sent to the three EPA Regional Administrators whose jurisdictions include the six previously identified Appalachian states (including West Virginia).  Neither the State nor WVDEP were consulted about the Detailed Guidance or the standards announced therein.

75.     The Detailed Guidance stated that EPA had conducted assessments of CWA Section 402 and 404 permitting in Appalachia in September/October 2009 that had "identified concerns related to effective protection of downstream water quality consistent with requirements of the CWA."  *Id.* at 6.  Additionally, under the ECP, EPA and the Corps allegedly had "found that many of these projects may not be consistent

---

[9]     The Detailed Guidance, attached as Exhibit G, is also available at http://water.epa.gov/lawsregs/guidance/wetlands/upload/2010_04_01_wetlands_guidance_appalachian_mtntop_mining_detailed.pdf. The Environmental Justice Executive Order, issued by President Clinton on February 11, 1994, directed federal agencies to make the goal of achieving environmental justice part of their mission.  It is available at http://www.epa.gov/fedreg/eo/eo12898.htm (last visited Oct. 5, 2010).

with EPA and Corps regulations, including the Section 404(b)(1) Guidelines.  As many as 80% of these permits raised concerns with respect to compliance with state narrative water quality standards, while more than half raised concern for the potential for significant degradation of aquatic ecosystems." *Id.*  Accordingly, the Detailed Guidance Memorandum set forth new standards to be employed in reviewing those permits, including, *inter alia*, a new water conductivity standard derived in part from two studies that have not been subjected to peer review, new parameters of the types of mining that presumptively have significant negative impacts on the environment, standards and procedures for NPDES permits and for NEPA review, and amendment of existing Section 404(b)(1) Guidelines under the CWA, as explained in greater detail below.

76.    Although EPA is now engaged in the process of seeking public comment on the Detailed Guidance, which it calls an "interim final document," the Detailed Guidance nevertheless became effective immediately upon issuance, and the EPA Regions were instructed "to begin using [it] immediately in [their] review of Appalachian surface coal mining activities." *Id.* at 1 n.1 & 2.

77.    EPA currently is applying the standards announced in the Detailed Guidance to review, comment upon, and object to proposed surface (and other) mining operations in West Virginia.  For example, on or about April 15, 2010, EPA began issuing comment and objection letters to WVDEP regarding pending permit applications in which it referenced the Detailed Guidance—two weeks after the Detailed Guidance was issued. EPA's actions in applying the Detailed Guidance, described in greater detail below, blatantly contradict its professed interest in receiving comments from the public, the

states, and the coal industry, and its pretense that the Detailed Guidance does not
constitute a final, binding agency action. *See* Ex. G, at 1 n.1 & 2 n.3.

### 1. The Detailed Guidance Creates a New Water Quality Standard That Amends Clean Water Act Sections 303, 401, 402, and 404

78.     EPA's Detailed Guidance announced a new water quality standard based on in-
stream conductivity to be used in assessing both Section 402 and Section 404 permits.
*See* Ex. G, at 8-13, 16-17, 18-19, 20, 22.

79.     EPA's conductivity standard provides that in-steam conductivity levels above
500 μS/cm are deemed "likely to be associated with adverse impacts to water quality that
may rise to the level of exceedances of narrative state water quality standards." *Id.* at 12.
If water quality modeling indicates that conductivity levels will exceed 500 μS/cm, "EPA
believes that reasonable potential likely exists to cause or contribute to an excursion
above applicable water standards; unless, based on site-specific data, the state has an
alternative interpretation of their [sic] water quality standards that is supported by
relevant science." *Id.* at 22. If in-stream conductivity levels are between 300 μS/cm and
500 μS/cm, EPA has declared that the "permitting authority [should] ensure that the
permit includes conditions that protect against conductivity levels exceeding 500 μS/cm."
*Id.* at 12, 22. But if conductivity levels are below 300 μS/cm, EPA announced that it
expects that those projects "will not cause a water quality standard violation." *Id.*

80.     EPA relied on at least three studies in adopting its new conductivity standard,
two of which have not been peer reviewed.[10] *See id.* at 11-12; and Ex. H, at 2, 3-4.[11]

---

[10]     Those studies are:  (1) EPA's study entitled "The Effects of Mountaintop Mines and Valley Fills
on Aquatic Ecosystems of the Central Appalachian Coalfields;" (2) EPA's "A Field-Based Aquatic Life
Benchmark for Conductivity in Central Appalachian Streams" (hereinafter referred to as "Benchmark
Conductivity Study"); and (3) the aforementioned study by Pond et al. entitled "Downstream effects of

Specifically, EPA relied upon two non-peer-reviewed studies:  (1) its non-peer-reviewed study summarizing the aquatic impacts of mountaintop mining and valley fills and (2) its draft Benchmark Conductivity Study, which concluded "that genus-level impacts to the biological community occur at conductivity levels of 300 µS/cm."  *See* Ex. G, at 12. Those studies currently are undergoing public comment and have been submitted for peer review to the EPA Science Advisory Board.

81.    Even though two of the studies upon which EPA relies have not been peer reviewed, EPA has stated that "[i]n the interim, EPA views the reports as providing information . . . that informs the review of" proposed mining permits.  *Id.* at 2. Rather, "[o]nce EPA's draft conductivity report is finalized" following peer review, it "will evaluate whether changes to the conductivity benchmarks are appropriate."  *Id.* at 22.

82.    The Detailed Guidance provides that EPA regions "should convey their conclusions with respect to possible exceedences of water quality standards to the Corps and, if appropriate changes to the permit are not made in response to those water quality concerns, may proceed under the 404(q) MOA and/or Section 404(c)" to block the permit's issuance.  *Id.* at 19.

83.    EPA is using the new conductivity standard to supplant West Virginia's properly adopted (and EPA-approved) narrative water quality standards.  EPA has stated that it will ensure that the conductivity standard is not exceeded "*even if a state has*

---

mountaintop coal mining:  comparing biological conditions using family- and genus-level macroinvertebrate bioassessment tools."

[11]    Exhibit H is EPA's Guidance Summary issued on April 1, 2010, that summarizes the Detailed Guidance.

*issued a water quality certification under Section 401 of the CWA.*" *Id.* at 18 (emphasis added).

84.    EPA has announced that it expects states to use its new conductivity standard in issuing NPDES permits under CWA Section 402.  The Detailed Guidance states:  "The state must provide adequate documentation in the permit fact sheet or statement of basis to demonstrate that it has assessed reasonable potential and, where necessary, developed effluent limits (or other permit conditions) adequate to protect all applicable water quality standards, including narrative water quality standards. . . . Where EPA concludes that the state's explanation is not adequate, or the state fails to provide an explanation of how it has interpreted or applied its narrative quality standards, EPA may object to the permit in accordance with the provisions of 40 C.F.R. Section 123.44(c)." *Id.* at 13.

85.    Neither the State of West Virginia nor WVDEP have adopted EPA's conductivity standard or were consulted in its development.

86.    EPA's conductivity standard ignores all other measures of the environmental health of a stream, concentrating instead on a single measure affecting one order of insects, *Ephemeroptera,* commonly known as "mayflies."

87.    The standard usurps West Virginia's authority to establish water quality standards under CWA Section 303, WVDEP's authority to interpret and implement those standards under 402, and WVDEP's authority to issue water quality certifications under CWA Section 401.

88.    West Virginia's properly promulgated narrative water quality standards, and the factors developed by WVDEP to implement those narrative standards, look more

holistically at the affected aquatic environment and provide a more accurate measure of a stream's well-being.

89.    On August 18, 2010, WVDEP promulgated a Permitting Guidance for Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, described in further detail below and attached to this Complaint as Exhibit I.   The Permitting Guidance was intended to assist WVDEP permit writers in developing NPDES permit conditions for surface coal mining operations and to provide guidance for the issuance of those permits under West Virginia's narrative water quality standards.   In the Permitting Guidance, WVDEP reaffirmed its commitment to West Virginia's narrative water quality standards and the agency's "holistic watershed management approach." Ex. I, at 1.

90.    As WVDEP explained in its Justification and Background document that explains its conclusions in the Permitting Guidance, it has concluded that its Permitting Guidance, rather than EPA's Detailed Guidance, "is the more appropriate approach for West Virginia for several reasons.  First, it involves subject matter uniquely within DEP's expertise and special knowledge.  Further, while [the Permitting Guidance] specifically addresses concerns related to the mining industry, it is designed to be adapted in the future to address all discharges to water bodies that will cause, or that have the reasonable potential to cause or contribute to, excursions from water quality standards.  Finally, [the Permitting Guidance] does not use an overbroad, generic criterion (i.e., conductivity) to set unattainable limits, but instead identifies specific pollutants that can be managed through the inclusion of appropriate whole effluent toxicity ("WET") monitoring and/or limits and best management practices ("BMPs") in NPDES permits, where there is

reasonable potential to cause or contribute to excursions from water quality criteria." *See* Ex. J, Justification and Background for Permitting Guidance (dated Aug. 12, 2010), at 2.[12]

91.    WVDEP also has stated that "[a] goal of the CWA and the [Water Pollution Control Act] is to protect the aquatic ecosystem as a whole; it is a holistic standard that requires a holistic approach to ecosystem assessment.  In contrast to numeric water quality criteria, which can be applied by analysis of samples of water taken at any discharge or monitoring point in a stream, compliance with a standard that protects the aquatic ecosystem must be assessed in the broader area comprising the ecosystem.  An ecosystem does not exist at a single point and, accordingly, its health cannot be assessed at a single point." *Id.* at 3.

92.    Moreover, WVDEP has determined that the Pond et al study is "flawed." *Id.* at 3.  WVDEP stated in its Justification and Background document that "[t]he Pond-Passmore Study . . . concludes that West Virginia's narrative standard is violated by surface coal mining operations based on the Study's application of two biologic assessment tools, the West Virginia Stream Condition Index ("WVSCI") and the draft Genus Level Index of Most Probable Stream Status ("GLIMPSS"), to samples of benthic macroinvertibrate life taken from these streams.  This conclusion is flawed for two reasons.  First, West Virginia does not use the draft GLIMPSS in its assessment of the biologic health of State streams.  Second, these tools are just that—tools.  They are not stand-alone determinations of compliance with the narrative standard." *Id.* WVDEP also

---

[12]    WVDEP's Permitting Guidance may also be found at http://www.dep.wv.gov/pio/ Documents/Narrative/2010-08-18.%20Narrative%20Standards%20Permitting%20Guidance%20 (Rev.%201).pdf.  WVDEP's Justification behind the Guidance Document is attached to this Complaint as Exhibit J, and is also available at http://www.dep.wv.gov/pio/Documents/Narrative/Narrative% 20Standards%20Guidance%20Justification.pdf.

opined that EPA's conductivity standard is not sufficient to determine the health of a stream. *See id.* at 5.

93.     Consequently, and for reasons discussed in greater detail in the Justification and Background document, WVDEP concluded that its Permitting Guidance "is the appropriate methodology for implementing West Virginia's narrative water quality standards, because it is consistent with the Federal Regulations regarding establishing limitations, standards, and other permit conditions for NPDES programs, and it incorporates a holistic approach to ecosystem assessment and protection." *Id.* at 4.

94.     Despite West Virginia's continued adherence to its properly promulgated narrative water quality standards, EPA began referring to its new conductivity standard in comment and objection letters to WVDEP on or about April 19, 2010, and continues to do so.

95.     EPA explicitly began to refer to the draft, non-peer-reviewed Benchmark Conductivity Study in letters to WVDEP on or about May 17, 2010, and has used the new conductivity standard to object to NPDES permits under consideration by WVDEP.  EPA has used the Detailed Guidance and its new conductivity standard to cause undue delay in the issuance of Section 402 permits for surface coal mining operations within West Virginia.  EPA has requested that WVDEP delay issuing NPDES permits until EPA determines that the conductivity water quality standard has been satisfied.  EPA also has issued interim objections to pending NPDES permits based on WVDEP's failure to provide conductivity data.  In some cases, EPA's objections were received by WVDEP after the comment period had closed.  Nevertheless, EPA urged WVDEP to consider its comments, including those regarding conductivity, because EPA claimed that WVDEP's

33

failure to do could result in a final permit that was inconsistent with the NPDES permit regulations.

96.     There has been a marked decrease in the issuance of NPDES permits issued to surface mining operations, underground mining operations and related support facilities, and bond forfeiture sites as compared to previous years.

97.     EPA also has used the Detailed Guidance and its conductivity standard to delay and otherwise impede the Corps' issuance of Section 404 permits for surface coal mining operations within West Virginia.  Of the twenty-three permits targeted for ECP review, the Corps has issued Section 404 permits for only two surface mining projects, while six applications have been withdrawn and fifteen have been pending for over a year.  This constitutes undue delay as well as a marked decrease in the issuance of Section 404 permits as compared to previous years.

### 2. The Detailed Guidance Amended the Section 404(b)(1) Guidelines

98.     The Detailed Guidance adopts new standards for the Corps to follow, effectively amending the Section 404(b)(1) Guidelines outside of the formal rulemaking process required by the APA.  For example, the Detailed Memorandum instructs the Corps that its cumulative impacts analysis should be based on a watershed scale, stating that "[u]sing a watershed-scale analysis (e.g., HUC-12 analyses) would be an effective way to examine the cumulative environmental and human health impacts from past, present, and reasonably foreseeable actions, including federal and non-federal actions." Ex. G, at 29.

99.     The Detailed Guidance also amended the Section 404(b)(1) Guidelines by instructing the Corps to review Section 404 permits using the new conductivity standard, as discussed above.

### 3. The Detailed Guidance Usurps the Corps' Analysis of Section 404 Permits under the National Environmental Policy Act

100.    In the Detailed Guidance, EPA announced a blanket rule prohibiting the Corps' issuance of a Finding of No Significant Impact or "FONSI" under NEPA based on certain types of mitigation.  The Detailed Guidance states that no mitigation credit should be given for sediment, groin, or other water control ditches required for mining projects under SMCRA and CWA Section 402.  *Id.* at 24, 30.  It provides that "construction of these ditches should not be used as a basis for supporting a FONSI" and that "mitigation measures that rely on establishing or re-establishing streams, rather than rehabilitating or enhancing existing streams, have less certainty of successfully offsetting impacts and should generally not be used to support a FONSI."  *Id.* at 30.

101.    The Detailed Guidance also imposes a general presumption for the Corps to apply in analyzing Section 404 permits under NEPA.  Specifically, EPA states that "projects that involve more than one mile of stream loss or more than one valley fill are likely to result in significant adverse impacts."  *Id.* at 30.  Consequently, if a proposed permit would result in more than one valley fill or the loss of more than one mile of stream, the Corps is required to complete an Environmental Impact Statement or "EIS."

102.    Regulations promulgated by the Council on Environmental Quality ("CEQ") require agencies to include an assessment of the cumulative impacts of human activity in their NEPA analysis, that is, the combined, incremental effects of human activity on the environment.  *See* 40 C.F.R. §§ 1507.3, 1508.7, 1508.25.  In the Detailed Guidance, EPA

directs the Corps that its cumulative impacts analysis should be based on a watershed scale. *Id.* at 29.

103.   EPA is not authorized to direct the Corps to utilize that scale or to promulgate any of the NEPA rules discussed above.  NEPA procedures may be adopted only *after* an opportunity for public review and after review by CEQ.  *See* 40 C.F.R. § 1507.3.  EPA has not submitted those procedures to the public or to CEQ.  Accordingly, they violate NEPA and exceed EPA's authority.

104.   As a related matter, the Detailed Guidance also established standards under which EPA will *always* challenge the issuance of a Corps permit.  It states that, "although the decision to prepare an EIS rests with the Corps and OSM . . . EPA must 'refer' to [the Council on Environmental Quality] matters that the Administrator finds are 'unsatisfactory from the standpoint of public health or welfare or environmental quality.'"  *Id.* (emphasis added).  EPA therefore will not follow the objection procedure established in 33 U.S.C. § 1344(c), but will automatically object if the Corps approves a permit that does not comply with the extra-regulatory standards set forth in the Detailed Guidance.

105.   This point was emphasized in the Guidance Summary Memorandum EPA issued on April 1, 2010.  That Memorandum, attached to this Complaint as Exhibit H,[13] summarized the more lengthy Detailed Guidance, and stated that "[EPA] expect[s] that, generally, it will be easier for projects with no or few valley fills to demonstrate that they comply with the requirements of the CWA and the 404(b)(1) Guidelines.  Conversely, projects with multiple valley fills will generally raise serious questions about their

---

[13]      That Memorandum may also be found at http://water.epa.gov/lawsregs/guidance/wetlands/upload/ 2010_04_01_wetlands_guidance_appalachian_mtntop_mining_summary.pdf.

compliance with CWA requirements and may require permit objection under 402 or elevation and possible veto under 404." Ex. H, at 4.

### 4. The Detailed Guidance Improperly Regulates Mining Operational Practices under SMCRA

106.    Finally, in the Detailed Guidance, EPA included several directions to the Corps that improperly infringe upon West Virginia's permitting authority under SMCRA.  For example, EPA states that Section 404 mitigation credit should be denied for lateral drainage ditches, *see* Ex. G, at 24, which are an approved mitigation technique under 30 U.S.C. § 1265(b)(22)(D).[14]

107.    Similarly, the Detailed Guidance Memorandum enumerates several "best management practices" that EPA "expects . . . will help to reduce or eliminate potential increases in conductivity levels in surface waters downstream of mining-related discharges . . . ." *Id.*  EPA rejects many of the mining industry's proposed management practices as "currently unproven in their effectiveness to protect water quality and to prevent significant degradation." *Id.*  EPA also prescribes what it considers to be a best practice, saying that multiple valley fills should be sequenced for projects proposing more than one valley fill and that permittees should demonstrate compliance with applicable water quality standards at each valley fill before being allowed to begin construction of the next fill. *See id.* at 24-25.

108.    The Detailed Guidance Memorandum also sets forth a presumption that "[h]igh-ratio mining operations generally do not represent the least environmentally damaging alternative" and directs that "[p]rojects should also incorporate

---

[14]    SMCRA provides that the surface mining waste disposal area may not contain springs, natural water courses or wet weather seeps unless lateral drains are constructed so that water will not filtrate into the spoil pile. *See* 30 U.S.C. § 1265(b)(22)(D).  EPA improperly instructs the Corps to deny Section 404 mitigation credit for those types of drains.

environmentally effective limits on the linear extent of steam impacts per ton of excess soil produced through a robust alternatives analysis." *Id.* at 26.

109.   Mining management practices such as sequencing are part of the SMCRA permitting process and therefore fall under the authority of WVDEP and the State of West Virginia.  The Detailed Guidance's attempt to regulate those practices is contrary to SMCRA.

## CLAIMS FOR RELIEF

### COUNT I

#### The ECP is a Federal Rule Promulgated in
#### Violation of the Administrative Procedure Act

110.   Plaintiffs reassert the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

111.   The ECP constitutes a substantive federal rule.  It binds both EPA and the Corps to a decision-making process that affects the outcome of those agencies' permitting decisions.  This, in turn, has a direct effect upon WVDEP's permitting responsibilities.

112.   The ECP also amounts to a substantive revision of prior federal regulations codified at 33 C.F.R. Part 325.

113.   The ECP is a final agency action because it became effective upon its issuance.  As detailed herein, EPA and the Corps have reviewed and continue to review permit applications from West Virginia under the ECP.

114.   Therefore, because the ECP is a substantive, final federal rule, and also because it revised prior federal regulations, Defendants should have complied with the notice and comment requirements of APA Section 553 (5 U.S.C. 553(b) and (c)) in

promulgating those documents.  They did not; Defendants issued the ECP without giving the public notice or an opportunity to comment.

115.   Accordingly, Defendants impermissibly evaded the requirements of APA Section 553 when they issued the ECP, and the ECP should be set aside as arbitrary, capricious, an abuse of agency discretion, and as issued outside the procedure required by federal administrative law.

**COUNT II**

**The Detailed Guidance is a Federal Rule Promulgated in
Violation of the Administrative Procedure Act**

116.   Plaintiffs reassert the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

117.   Although the Detailed Guidance nominally is an interim rule and EPA is now seeking public comment regarding that document and the standards announced therein, in practice the Detailed Guidance became effective upon issuance and has had immediate and substantial impact upon agency actions.  EPA has applied the Detailed Guidance to review, comment upon, and object to permit applications from West Virginia.

118.   The Detailed Guidance is therefore a substantive federal rule that has direct effects upon the WVDEP and its permitting responsibilities.

119.   Furthermore, the Detailed Guidance substantively revises and amends the CWA 404(b)(1) Guidelines (40 C.F.R. Part 230), CWA water quality standards regulations (40 C.F.R. Part 131), and CWA permitting regulations (40 C.F.R. Parts 122 and 125).

120.   Because the Detailed Guidance is a substantive, final federal rule that became effective immediately upon issuance, and because it revised and amended prior federal

39

regulations,  EPA should have complied with the notice and comment rulemaking requirements of APA Section 553 (5 U.S.C. 553(b) and (c)) in promulgating the Detailed Guidance.  It did not do so.

121.  Accordingly, Defendants violated APA Section 553 by issuing the Detailed Guidance without proper notice and opportunity for comment, and the Detailed Guidance should be set aside as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and as issued without complying with the procedure required by federal administrative law.

## COUNT III

### The ECP Violates the Clean Water Act

122.  Plaintiffs reassert the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

123.  CWA Section 404(a) gives authority to the Corps to issue permits for the discharge of dredged-or-fill material into the navigable waters of the United States.  *See* 33 U.S.C. 1344(a).  Consistent with this authorization, the Corps has recognized in its regulations that a Section 404 permit applicant has the right to a "full public interest review and *independent decision* by the [Corps'] district or division engineer." 33 C.F.R. § 325.2(e)(3) (emphasis added).

124.  The ECP was not issued pursuant to any statutory direction or authorization.

125.  The ECP allows EPA to supplant the Corps at the outset of the Section 404 permitting process.  Through the ECP, EPA controls a new permit review process that falls completely outside of the codified statutory framework.  EPA and the Corps have

applied, and continue to apply, the ECP to review permit applications originating in West Virginia.

126.   Accordingly, the ECP violates the CWA's delegation of authority to the Corps as the Section 404 permitting authority, thereby upsetting the balance of authority that Congress struck between EPA and the Corps in the CWA. *See* 33 U.S.C. § 1344(a)-(b).

127.   The ECP violates 33 C.F.R. § 325.2(e)(3)'s guarantee to permit applicants that their applications will be independently reviewed by the Corps.

128.   Additionally, the ECP violates CWA Section 404's directive "to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits under this section." 33 U.S.C. § 1344(q).  The ECP runs completely counter to the Congressional goal of assuring "to the maximum extent practicable" that the Corps reach a decision on Section 404 permit applications "not later than the ninetieth [90th] day after the date the notice for such applicants is published," *id.*, which publication must occur within 15 days after an application is wholly submitted, 33 U.S.C. § 1344(q).  The history of Section 404 permit applications in West Virginia since the institution of the ECP, *see, e.g., supra* at paragraphs 68-73, makes it abundantly clear that the ECP is thwarting the Congressional timelines expressed in CWA Section 404(q).

129.   For the above reasons, the ECP violates the CWA in multiple respects and should be set aside under 5 U.S.C. § 706(2).

## COUNT IV

### The Detailed Guidance Violates the Clean Water Act

130.   Plaintiffs reassert the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

131.   Section 303(c)(1) of the CWA empowers "[t]he Governor of a State or the State water pollution control agency" to "review[] applicable water quality standards and, as appropriate, modify[] and adopt[] standards." 33 U.S.C. § 1313(c)(1).   EPA has affirmed the states' authority over water quality standards by regulation, pronouncing that "States . . . are responsible for reviewing, establishing, and revising water quality standards. 40 C.F.R. § 131.4.  Historically, EPA consistently construed and applied the CWA and its own regulations in a manner consistent with the position that EPA does not perform federal rulemaking to establish water quality standards and that it is *the states* that establish such standards.

132.   The West Virginia Legislature has adopted narrative quality standards, which are described above, *supra*, at paragraphs 22-24.  WVDEP is charged with interpreting and implementing those standards, as described above, *supra*, at paragraphs 88-93.

133.   In a marked departure from EPA's prior practice, the Detailed Guidance imposes a new water quality standard, peremptorily pronouncing that "in-stream conductivity levels above 500 µS/cm are likely to be associated with adverse impacts" to water quality. Ex. G, at 12.  Further, EPA directed the EPA Regions to "work with the permitting authority to ensure that the permit includes conditions that protect against conductivity levels exceeding 500 µS/cm." *Id.*  EPA has pledged to ensure that the conductivity standard is not exceeded "*even if a state has issued a water quality certification under Section 401 of the CWA.*" *Id.* at 18 (emphasis added).

134.   Neither West Virginia (nor any other state) initiated the new conductivity water quality criterion.  Moreover, the EPA Administrator did not prepare and publish proposed regulations setting forth that new standard, *see* 33 U.S.C. § 1313(c)(4).

135.   EPA has applied—and continues to apply—the Detailed Guidance's new water conductivity standard to review Section 404 and 402 permit applications from West Virginia. *See, e.g.,* paragraphs 57, 59, 83-84, 94-97, *supra.*

136.   The Detailed Guidance completely bypassed CWA Section 303(c)'s procedure for creating new water quality standards when it pronounced a new standard based on in-stream conductivity.  Because the Detailed Guidance violates both the CWA and EPA's regulations interpreting the CWA, it should be struck down under 5 U.S.C. § 706(2), and EPA and the Corps should be enjoined from applying the water conductivity standard to Section 404 or 402 permitting decisions.

## COUNT V

**The New Water Conductivity Standard is Arbitrary and Capricious under the APA**

137.   Plaintiffs reassert the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

138.   The Detailed Guidance announces a new water conductivity standard, as described *supra* at paragraphs 57, 59, 78-84, 86.  EPA has determined that in-steam conductivity levels above 500 µS/cm are "likely to be associated with adverse impacts to water quality that may rise to the level of exceedances of narrative state water quality standards." Ex. G, at 12.  If water quality modeling indicates that conductivity levels will exceed 500 µS/cm, "EPA believes that reasonable potential likely exists to cause or contribute to an excursion above applicable water standards; unless, based on site-specific data, the state has an alternative interpretation of their water quality standards that is supported by relevant science." *Id.* at 22.  If in-stream conductivity levels are between 300 µS/cm and 500 µS/cm, EPA has declared that the "permitting authority

43

[should] ensure that the permit includes conditions that protect against conductivity levels exceeding 500 µS/cm." *Id.* at 12, 22.  But if conductivity levels are below 300 µS/cm, EPA has announced that it expects that those projects "will not cause a water quality standard violation." *Id.*

139.   In adopting those standards, EPA relies upon two draft scientific studies that have not yet been peer reviewed. *See* paragraphs 80-81, *supra*.  EPA does not explain why it chose to rely on those studies, why a sole criterion (conductivity) is an adequate measure of the overall health of a stream, why mayflies are a good predictor of the health of the much larger aquatic and human environment, or why conductivity levels above 500 µS/cm are likely to cause exceedances of West Virginia's narrative water quality standards.  In fact, EPA makes no effort to cite the specific state narrative water quality standards that it claims are likely to be violated at conductivity levels above 500 µS/cm.

140.   EPA has not explained why the new conductivity standard applies only to these six Appalachian states and not others, or how the conductivity standard applies uniformly to the various topographical areas of those six states.

141.   EPA has utilized its new conductivity standard in reviewing, commenting on, and objecting to West Virginia Section 402 and 404 permits and has pledged to ensure that states apply that conductivity standard.  EPA has stated that it will ensure that the conductivity standard is not exceeded "*even if a state has issued a water quality certification under Section 401 of the CWA.*" *Id.* at 18 (emphasis added).

142.   EPA has requested conductivity data from WVDEP and has required that WVDEP delay issuing NPDES permits until EPA determines that the conductivity water

quality standard has been satisfied.  EPA also has issued interim objections to pending

NPDES permits based on WVDEP's failure to include conductivity data.

143.   EPA has used the Detailed Guidance and its new conductivity standard to

delay and otherwise impede the Corps' issuance of Section 404 permits for surface coal

mining operations in West Virginia.

144.   In adopting its new conductivity standard, EPA has acted arbitrarily and

capriciously by (1) relying on questionable, unverified scientific literature, and by (2)

declaring that a certain conductivity level is linked to exceedances of unspecified state

water quality standards.  There can be no rational connection to violations of state water

quality standards because EPA has not even specified which standards will be violated.

A court has "the duty to review [an agency's] presumptions both for consistency with the

Act, and for rationality."   *N.L.R.B. v. Baptist Hosp., Inc.*, 442 U.S. 773, 787 (1979)

(citation omitted) (internal quotation marks omitted).

145.   Accordingly, this Court should set aside the conductivity standard announced

in the Detailed Guidance as arbitrary, capricious and unlawful under 5 U.S.C. § 706(2),

and EPA should be enjoined from applying its new standard.

## COUNT VI

### The Detailed Guidance Is Contrary to and Exceeds EPA's Authority under the National Environmental Policy Act

146.   Plaintiffs reassert the allegations contained in the preceding paragraphs as

though the same were fully set forth herein.

147.   The Corps is the lead agency responsible for analyzing CWA Section 404

dredged-or-fill permit applications under NEPA.  *See* 33 C.F.R. § 325.2(a)(4), (6); 33

C.F.R. pt. 325, App. B, § 7(b)(1), (2).  In preparing NEPA documents, the district

engineer must follow the Corps' NEPA Implementation Procedures codified at 33 C.F.R. pt. 325, Appendix B.

148.   Because the Corps is the lead agency charged with analyzing Section 404 permits under NEPA, EPA's role is limited.  EPA generally may review and comment on federal actions that affect the quality of the environment.   Moreover, if the Corps prepares an EIS, EPA may review its sufficiency.

149.   To determine whether a proposed action may have significant environmental effects, and therefore whether an EIS must be prepared, the Corps is required to examine both the context of the particular operation and the severity of that operation's environmental impact.  Federal regulations require this determination to be made on a *case-by-case basis.  See* 40 C.F.R. § 1508.27.

150.   EPA does not have the statutory or regulatory authority to decide as a *general matter* that certain types of projects will have significant adverse environmental impacts and that, as a consequence, the Corps must prepare an EIS in those cases.   Nonetheless, the Detailed Guidance announces that "projects that involve more than one mile of stream loss or more than one valley fill are likely to result in significant adverse impacts." Ex. G, at 30.  That presumption violates NEPA and exceeds EPA's authority.

151.   Even if the Corps determines that a particular mining operation will have a significant environmental impact, it may avoid preparing an EIS if it finds that the mining owner will take mitigating measures that will reduce the operation's environmental impact below the level of environmental significance under NEPA.   In that case, the Corps issues a mitigated FONSI.

152.  Despite the fact that the Corps has the authority to evaluate mitigation measures and to decide whether to issue a FONSI, EPA states in the Detailed Guidance that no mitigation credit should be given for sediment, groin, or other water control ditches and that "mitigation measures that rely on establishing or re-establishing streams, rather than rehabilitating or enhancing existing streams, have less certainty of successfully offsetting impacts and should generally not be used to support a FONSI." Ex. G, at 24, 30.  Those rules violate NEPA and exceed EPA's authority.

153.  Regulations promulgated by the CEQ require agencies to include an assessment of the cumulative impacts of human activity in their NEPA analysis, that is, the combined, incremental effects of human activity on the environment.  *See* 40 C.F.R. §§ 1507.3, 1508.7, 1508.25.  In the Detailed Guidance, EPA directs the Corps that its cumulative impacts analysis should be based on a watershed scale.  *See* Ex. G, at 29.

154.  EPA is not authorized to direct the Corps to utilize that scale or to promulgate any of the NEPA rules discussed above.  NEPA procedures may be adopted only *after* an opportunity for public review and after review by CEQ.  *See* 40 C.F.R. § 1507.3.  EPA has not submitted those procedures to the public or to CEQ.  Accordingly, they violate NEPA and exceed EPA's authority.

155.  Although EPA purports to recognize that "the decision to prepare an EIS rests with the Corps and OSM," EPA nevertheless directs its Regions that they *must* 'refer' to CEQ matters that the Administrator finds are 'unsatisfactory from the standpoint of public health or welfare or environmental quality.'"  Ex. G, at 30 (emphasis added). Clearly, EPA expects that its NEPA proclamations in the Detailed Guidance will be followed by the Corps.  Otherwise, EPA will act to block the permit.

156.   Despite the invalidity of the new NEPA presumptions and standards announced in the Detailed Guidance, EPA has applied them in reviewing Section 404 permits from West Virginia and in making recommendations to the Corps regarding the same.

157.   For these reasons, the Detailed Guidance violates NEPA.  It should be held unlawful and set aside under 5 U.S.C. § 706(2), and EPA and the Corps should be enjoined from applying the NEPA standards announced therein in making Section 404 or 402 permitting decisions.

## COUNT VII

**The Detailed Guidance Violates the Surface Mining Control and Reclamation Act**

158.   Plaintiffs reassert the allegations contained in the preceding paragraphs as though the same were fully set forth herein.

159.   SMCRA, 30 U.S.C. § 1201 *et seq.*, establishes a regulatory program that regulates the disposal of excess spoil material from surface coal mining operations. SMCRA utilizes what is known as a cooperative federalism approach, whereby States have "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" so long as the Department of Interior ("DOI") and the Office of Surface Mining ("OSM") have approved the state's regulatory program.  *See* 30 U.S.C. §§ 1201(f), 1253.

160.   WVDEP's SMCRA regulatory program was approved in 1981.  Accordingly, WVDEP has exclusive jurisdiction over the regulation of valley fills and the disposal of excess spoil in the State of West Virginia, and anyone wishing to engage in surface coal mining in the State must obtain a permit from WVDEP. *See id.* § 1256(a).

161.   WVDEP operates its SMCRA regulatory program subject to the continued validity of various federal laws, including the CWA and NEPA. *See id.* § 1292.

162.   In the Detailed Guidance, EPA declares that it has identified what it believes to be the best management practices for the surface mining industry and rejects existing practices adopted by that industry as "unproven in their effectiveness." Ex. K, at 24. For example, EPA purports to require permittees to sequence multiple valley fills for surface mining projects proposing more than one valley fill and to require permittees to demonstrate compliance with applicable water quality standards at each valley fill before being allowed to begin construction of the next fill. *See id.* at 24-25.

163.   EPA has no authority to regulate surface mining management practices under any of the statutes enumerated in 30 U.S.C. § 1292.

164.   EPA's proposed best management practices, and its rejection of existing practices, have not been evaluated by OSM or West Virginia.

165.   EPA's attempt to regulate surface mining procedures invades the regulatory authority that Congress granted to West Virginia under SMCRA.

166.   Accordingly, EPA has exceeded its authority, and the Detailed Guidance should be set aside as contrary to SMCRA.

### PRAYER FOR RELIEF

WHEREFORE, in light of the allegations herein, Plaintiffs Randy C. Huffman, Cabinet Secretary of the West Virginia Department of Environmental Protection, and the State of West Virginia respectfully request that this Court enter judgment in their favor and against Defendants, along with the following relief:

1.  A declaration that EPA and the Corps violated the Administrative Procedures Act by issuing the ECP without following formal rulemaking procedures and by using the extra-regulatory ECP review process to review and delay pending West Virginia surface mining permits;

2.  A declaration that EPA violated the Administrative Procedures Act by issuing the Detailed Guidance without following formal rulemaking procedures and in following the standards announced in the Detailed Guidance as *de facto* substantive rules that EPA has used to review, comment upon, and object to West Virginia permits;

3.  A declaration that the ECP and the Detailed Guidance are contrary to the Clean Water Act, the National Environmental Policy Act, and the Surface Mining Control and Reclamation Act, or are otherwise arbitrary, capricious, or an abuse of discretion for the reasons discussed herein, and have caused undue delay in surface mining-permit review affecting West Virginia permits at the federal and state levels;

4.  A declaration that the Detailed Guidance has infringed upon the State of West Virginia and WVDEP's authority to set and interpret water quality standards, to administer NPDES and Surface Mining Control and Reclamation Act permits, and to monitor and protect the quality of the State's streams and the aquatic ecosystems therein;

5.  An order vacating the ECP and the Detailed Guidance as violative of the Administrative Procedures Act;

6.   An order enjoining and restraining Defendants, their agents, employees, successors, and all persons acting in concert with or participating with them from enforcing, applying or implementing the ECP and the Detailed Guidance;

7.   An order directing the Corps and EPA to process and review all pending surface mining permits pursuant to the properly codified regulatory process and timelines in place before the issuance of the ECP and the Detailed Guidance;

8.   A declaration that the State of West Virginia has the authority to establish water quality standards under the existing statutory and regulatory regime, and that WVDEP has the authority to implement those standards and to administer the National Pollutant Discharge Elimination System and Surface Mining Control and Reclamation Act regulatory processes;

9.   An order awarding reasonable attorney's fees and costs; and

10.  An order granting Plaintiffs such other relief as may be necessary and appropriate or as the Court deems to be just and proper.

Respectfully submitted,


**RANDY C. HUFFMAN, in his official capacity as
CABINET SECRETARY OF THE WEST VIRGINIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION,
and acting on behalf of the STATE OF WEST VIRGINIA,**


**Plaintiffs, by Counsel**




/s/Benjamin L. Bailey
**Benjamin L. Bailey, Esq. (WVSB #200)
Bailey & Glasser LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
(304) 342-1110** *facsimile*


**Kristin A. Boggs, Esq. (WVSB #10015)
General Counsel
West Virginia Department of Environmental Protection
601 57th Street
Charleston, West Virginia  25304
(304) 926-0440
(304) 926-0447** *facsimile*


**Dated:  October 6, 2010**